## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

_____

|  |  |
|---|---|
| **UNITED STATES SECURITIES** : | |
| **AND EXCHANGE COMMISSION,** : | **CASE NO.  1:07-cv-4538** |
| : | |
| **Plaintiff,** : | **Hon. Elaine E. Bucklo** |
| : | |
| **v.** : | **Magistrate Judge Arlander Keys** |
| : | |
| **BRIAN N. HOLLNAGEL and** : | |
| **BCI AIRCRAFT LEASING, INC.** : | |
| : | |
| **Defendants.** : | |

_____:

### PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR ORDER TO SHOW CAUSE

Plaintiff, United States Securities and Exchange Commission ("SEC"), respectfully moves this Court for an order to show cause why Defendants Brian N. Hollnagel ("Hollnagel") and BCI Aircraft Leasing, Inc. ("BCI") (collectively "Defendants") should not be held in contempt of the Court's August 22, 2007 Order ("Order") in light of their multiple violations of the Order.[1]  Defendants are not repaying all of the investors in cash as required by the Order. Defendants have also failed to comply, and continue to fail to comply, with the reporting requirements in the Order.  Defendants appear to believe they are not required to comply with those provisions of the Order, have provided virtually no supporting information or documents to the SEC necessary to its role as monitor, and have misled the Court regarding their ability to repay investors.  It also appears that Defendants have conducted new fraudulent securities sales, in violation of the Order and the federal securities law.

_____

[1]      This Motion to Show Cause also serves to correct misstatements and misleading statements in Defendants' September 19th Surreply, Docket No. 47.  In addition, as part of the SEC's monitoring role under the Order, this filing serves as an updated report to the Court regarding Defendants' progress in repaying investors.

Defendants misled the Court during the hearing and have subsequently made materially misleading statements in its Reports to the SEC and its filings with the Court. While reporting to investors, the SEC, and the Court that great progress was being made and that their repayment plan was on track, Defendants were telling Bridgeview Bank that the death of the potential $36+ million buyout, and the seizure of funds by Bridgeview pursuant to BCI's default, was "truly, actually, killing us," and Defendants' counsel was telling Mr. Hollnagel that, unless the issues with Bridgeview were "cleared up in the VERY near future," his options "are few."[2] In the meantime, Defendants' former counsel, Ungaretti & Harris LLP, has filed an application to intervene in this matter because Defendants are using this Court's Order to justify not paying $500,000 in outstanding legal bills. Likewise, the SEC is aware of two other substantial creditors, one of which was required to be paid pursuant to a Court order, that have similarly not been paid. As is typical in collapsing Ponzi schemes, and despite displaying confidence regarding their financial health, Defendants simply do not have enough money to satisfy their investors and creditors. This is exactly the type of impending financial debacle that requires the appointment of a receiver.

Finally, in addition to the fact that Defendants have made a virtual mockery of this Court's Order through their contemptuous non-compliance, this Court needs to address Defendants' multiple violations of the Order as soon as possible because there is an immediate danger that Defendants continue to victimize investors. Instead of repaying investors with cash as required, Defendants Hollnagel and BCI, the same parties preliminarily found by this Court to have committed securities fraud, now appear to have made new securities offers and sales to previously victimized investors. Defendants' purported repayment plan appears to have reverted

---

[2] Hollnagel forwarded an email from his Counsel to an officer at Bridgeview Bank as part of an email to that officer. *See* Exhibit 1.

to a mere continuation of their original Ponzi scheme: pledging assets rightfully belonging to prior investors (but who were fraudulently bought out of their interests) to other investors, now as "repayment" of their investments. Defendants are doing all of this under a veil of secrecy, producing virtually nothing in response to the SEC's multiple requests for information and documents regarding these new transactions with investors and their repayment progress.

Alarmingly, Jason Hyatt ("Hyatt") and Jay Johnson ("Johnson"), the principals of Hyatt Johnson Capital, LLC ("Hyatt Johnson"), the purported representatives of 110 individual investors who invested nearly $23 million in BCI securities, have informed the SEC through counsel that they will assert their Fifth Amendment privilege against self-incrimination in response to SEC subpoenas. These subpoenas, among other things, seek information about their communications and dealings with Defendants regarding the new offers and sales of securities. In other words, not only do the Defendants not want this Court or the SEC to know anything about their dealings with investors (including new offers and sales of securities), but purported representatives of investors believe that there is a reasonable likelihood of criminal prosecution in connection with their dealings with Defendants, including possibly these new securities sales.[3] The SEC believes these are sufficiently disturbing developments to warrant immediate action by this Court, such as finding Defendants in contempt of the August 22nd order, imposing an asset freeze, and appointing a receiver, to protect investors from being further defrauded.

---

[3]      The entity Hyatt Johnson Capital LLC has produced documents and has promised to produce more. Of course, the entity cannot assert the Fifth Amendment privilege against self-incrimination. However, the SEC has recently learned that there is a substantial amount of information relating to Hyatt Johnson Capital in the possession of Hyatt and Johnson. Based on what its counsel has told the SEC, the office of Hyatt Johnson Capital was located in Johnson's home. This office had separate Hyatt Johnson Capital computers for Hyatt and Johnson. The SEC has been informed that there exists approximately 30 gigabytes of electronic information copied from those Hyatt Johnson Capital computers by counsel for Hyatt and Johnson, and these copies, and the original computers, remain in the possession of Hyatt and Johnson. Counsel for Hyatt Johnson Capital does not yet possess a copy of this information. Johnson, through Counsel, has informed the SEC that he intends to produce all Hyatt Johnson Capital material, but the SEC does not know whether Hyatt will do the same.

# I. THE COURT, FINDING FRAUD, IMPOSED NUMEROUS REQUIREMENTS ON DEFENDANTS IN ITS ORDER.

## A. The SEC's Complaint alleged fraud in the offer and sale, and later, in the offer and repurchase, of securities by Defendants.

The SEC filed its Complaint in this matter, along with a motion for a temporary restraining order, an asset freeze, and a receiver, against Defendants on August 13, 2007.  The Complaint alleged, among other things, that Defendants defrauded investors by, among other things, not purchasing aircraft on behalf of the investor LLC with investors' money, despite raising investor money for that express purpose, and by misappropriating assets or profits belonging to investors.  *See* Docket no. 1 at ¶¶ 74-128.  The Complaint also alleged that Defendants further defrauded investors through a buyback in the spring of 2007, when they made misleading statements regarding the status of the investments.  *See id.* at ¶¶ 182-95.  In particular, the SEC alleged that Defendants misrepresented the value of the investors' interests in the LLCs and thus fraudulently repurchased investors' interests in the LLCs, keeping the accumulated equity to themselves.  *See id.*  Defendants also sold or refinanced aircraft purchased using investor funds, or otherwise belonging to investors, in order to raise the money required to buy out other investors, without disclosing these facts to either set of investors.  *See id.* at ¶¶ 191-194.

## B. The Court issued an injunction against further antifraud violations.

On August 22, 2007, after a two day evidentiary hearing and hours of arguments from both parties, this Court issued a Temporary Injunction against Defendants which, among other things, prohibited them from further violations of certain of the anti-fraud provisions of the Federal securities laws.  The Court also entered a Memorandum Opinion and Order (the "Order").  That Order, among other things, made factual findings, including "It is undisputed that

BCI made material misrepresentations in its LLC offering documents..." to investors and that "[t]here can be no doubt that BCI and Hollnagel acted with scienter. There is also a risk of repetition." Order at 7-8. Based on these and other findings, the Court entered a temporary injunction enjoining Defendants from further securities fraud. Based on Defendants' repeated, comprehensive, and ongoing contempt of the Order, it appears that the Court's concerns about possible recidivism by Defendants were well-founded.

**C.      The Court ordered that Defendants repay investors and report information to the SEC.**

The Court declined the SEC's request for the appointment of a Receiver and an asset freeze, but rather, ordered that Defendants repay all of their noteholders within 60 days.[4]  In addition, the Court ordered that Defendants report to the SEC their progress in repaying investors, and imposed certain other reporting requirements on Defendants. It is apparent from the language and reasoning of the Order that the Court intended the repayment of investors to be in the form of cash. Indeed, that is what Defendants promised at the hearing.

During the hearing Defendants repeatedly promised the Court that investors would be repaid in cash if no asset freeze were instituted. For example, during closing arguments counsel for Defendants represented to the Court that Defendants were in negotiations "with regard to a transaction which will net well in excess of the $36 or $37 million that will be necessary to pay off" the remaining noteholders. *See* August 20, 2007 Transcript at 208. Counsel further represented to the Court that, notwithstanding the SEC's complaint and the temporary injunctive hearing, "that transaction is still on course." *Id.* at 209. Counsel for Defendants also stated to

---

[4]      These "noteholders" were all previously investors in LLCs managed by Defendants, certain of whom exchanged those equity interests for promissory notes guaranteed by BCI.

the Court that, no matter the outcome of that particular deal, Defendants still would have

sufficient cash to repay their investors.  Counsel stated:

> [i]n addition to that transaction, and I don't want to suggest that we don't think
> it's going to happen, there are three alternatives that the company was also
> working on that would generate *sufficient cash to pay these people off*.  Your
> Honor, as we look at what are now, I think, accepted financials, or at least not
> disputed financials, there's enough value here to do that.  There is a great plenty
> value here to do that in the $95 million net equity after paying everybody off on
> the evidence that's been presented to the Court.

*Id.* at 209 (emphasis added).

The Court specifically referenced these representations in its Order as the basis for not

issuing an asset freeze and appointing a Receiver.  In fact, the Court specifically noted that "the

SEC has not shown at present that BCI will not be able to pay the notes as BCI has represented

to the Court."  Order at 8-9.  The Court, while discussing the position of the noteholders, further

observed that the noteholders believed that Defendants have a greater ability "to obtain the funds

to pay the notes than a receiver…"  *Id.* at 8.  Thus, based on Defendants' representations and the

language and reasoning of the Court, the Order clearly contemplated that Defendants would

repay their noteholders in cash.

In addition to the repayment of noteholders, the Court imposed five specific reporting

conditions on Defendants:

> 1) BCI must report to the SEC on a weekly basis its progress in paying off the
> noteholders;
>
> 2) [BCI must] provide an immediate accounting of the LLC in which one investor
> continues to hold equity;
>
> 3) [BCI must] provide to the SEC on a weekly basis all proposed withdrawal of funds;
>
> 4) significant withdrawals (in excess of $20,000) may be made only with 48 hours notice
> to the SEC; [and]

6

> 5) all money paid to BCI or any BCI affiliate, including LLCs and Hollnagel in connection with BCI, shall be reported to the SEC on a weekly basis.

*Id.* at 9. Finally, the Court ordered that:

> If noteholders are not repaid within 60 days, or for any other reason it becomes apparent before that time that BCI will not be able to pay its noteholders, the SEC shall inform the Court and I will reconsider the SEC's request for a freeze of assets and appointment of a receiver.

*Id.* As discussed below, Defendants have violated virtually every provision of the Court's Order, and continue to do so.

## II. DEFENDANTS ARE NOT REPAYING INVESTORS IN CASH, AND HAVE STATED THEIR INTENTION TO NOT COMPLY WITH THE COURT'S ORDER TO REPAY INVESTORS IN CASH WITHIN 60 DAYS.

Defendants essentially concede that, over 30 days into the Court-ordered repayment period, they are unable to repay their investors with cash. Instead, Defendants have proposed to repay most remaining investors via the sales of new securities or the parceling out of aircraft or other assets. Defendants have stated that only two of the remaining noteholders, representing a total of about $10.7 million, are to be paid in cash "from the net proceeds of sale or financing transactions" which to this date have not yet occurred and may never occur. *See* Exhibit 2 to SEC's September 14th Reply, Docket No. 45, at 3. Hollnagel has told one of these investors that the transaction is unlikely to happen within 60 days of the Order. The other remaining noteholders, a total of about $33 million, have been or will be repaid by being given either assets or new securities, or in Defendants' words, "convey to them 100% of the ownership interests of entities owning specified aircraft subject to existing leases." *See id.*

Throughout the hearing, Defendants repeatedly represented to the Court that a potential $36+ million buyout of aircraft, later identified as involving Bridgeview Bank, was the lynchpin

of their plan to repay investors.[5]  As noted by the SEC in its September 14th Reply, this transaction ceased to be viable as of August 29th, when Bridgeview notified Defendants that there would be no such buyout.  Defendants failed to disclose this development to the SEC or to this Court.  Defendants later played down the importance of the death of this potential buyout, insisting that there were other potential deals in the works to repay investors, none of which have actually occurred.  However, this potential buyout was much more vital to Defendants' repayment ability than they have previously admitted.  The day that Bridgeview informed Defendants that the buyout was no longer viable, Mr. Hollnagel's counsel informed him that, unless these issues with Bridgeview were "cleared up in the VERY near future," his options "are few."  *See* Exhibit 1.  The next day, when Bridgeview seized another $2 million pursuant to a default by BCI on a loan from GMAC, Mr. Hollnagel told Bridgeview that this was "truly, actually, killing us."  *See* Exhibit 2.  Defendants have never admitted to investors, the Court, or to the SEC in its monitoring role, how devastating the Bridgeview and GMAC defaults and the death of the $36 million buyout were to their ability to repay investors.

Defendants' plan to no longer repay noteholders with cash was first acknowledged in their September 10th Response.  *See* Docket No. 43 at 5-7.  In their Response, Defendants claimed as a sign of "significant progress" that investors were paid $12.5 million on August 23, 2007.  However, Defendants failed to tell the Court in their Response that approximately $6 million of the checks for the $12.5 million repayment had been returned for insufficient funds.  *See id.* at 2-5.  Defendants have not further asserted that they could or would repay those investors in cash now that the checks have bounced.  In fact, Defendants have not paid these

---

[5]       It was the SEC, and not Defendants, who first identified Bridgeview as being the entity that Defendants claimed at the hearing would participate in a transaction with BCI that would generate enough cash to repay all investors.

investors cash. Instead, Defendants claimed that they would convey to three of these investors "100% ownership of specified aircraft in full satisfaction of BCI's obligations to them" and "100% ownership of a specified aircraft on lease, although in this case, BCI has agreed to repurchase this aircraft if and when a sale of the aircraft can be arranged" to another investor. *Id.* at 6. Defendants also stated that Hollnagel had "substantive and significant discussions" with two of the largest BCI investors, and has reached exit agreements with them. *Id.* Defendants omitted any details about these exit agreements, although clearly they bear directly upon Defendants' ability to repay, and progress in repaying, investors. These details are also necessary to the SEC's mandate to alert the Court if "it becomes apparent before [60 days have passed] that BCI will not be able to pay its noteholders." Order at 9. These are but two minor examples of Defendants' contempt of this Court's Order.

## III. DEFENDANTS ARE APPARENTLY ENGAGED IN NEW SECURITIES SALES AND OTHER SUSPECT TRANSACTIONS IN ORDER TO REPAY INVESTORS.

In their Response, Defendants also repeatedly claimed that they would be able to repay the remaining noteholders in cash. Defendants claimed, as they had repeatedly claimed at the hearing, that they were engaged in transactions that "would result in net proceeds more than sufficient to satisfy BCI's obligations in full to all remaining noteholders" and, that "BCI has solicited and received no less than three proposals for financing that would result in net proceeds to BCI more than sufficient to satisfy BCI's obligations in full." Docket No. 43 at 7.

Notwithstanding Defendants' September 10th pledge to repay the remaining noteholders in cash, along with claims of their ability to do so, just over a week later Defendants indicated that they would not fulfill this promise. In Defendants' September 19th Surreply, Defendants for the first time disclosed any details about its exit strategy with its largest investor, Hyatt Johnson.

9

In their Surreply, Defendants stated that the Hyatt Johnson repayment consisted of the conveyance of "100% ownership rights of numerous aircraft in satisfaction of approximately $21 million" due to Hyatt Johnson.  Docket No. 47 at 2-3.  Thus, it was not a repayment of cash to Hyatt Johnson or the 110 investors it represents, rather, simply an exchange of one security for another.[6]

Furthermore, in their September 19th Surreply, Defendants changed their September 10th promise "to satisfy BCI's obligations in full to all remaining noteholders" with cash, to now promising to repay only "those remaining noteholders *desiring cash*."  *Id.* at 4 (emphasis added). At least three other investors are being repaid with new securities, and it is apparent that Defendants are unable to repay their noteholders in cash.  In fact, all remaining noteholders wanted to be paid in cash.  However, Defendants have informed numerous investors that they cannot repay them in cash.  Instead, Defendants have offered investors an all or nothing proposition: accept equity interests in aircraft or receive nothing in exchange for their promissory notes.  Hollnagel told at least one investor that if a receiver is ever appointed, all of Defendants' aircraft will be seized by banks, and that investors will then receive nothing.[7]  Consequently, investors appear to be accepting "repayment" offers from Defendants out of fear of recovering nothing, not because such offers fairly represent what investors are entitled to, or desire, and certainly not resulting from being given full and complete disclosure of all material information.

---

[6]    As was stated in the SEC's September 14th Reply, without the knowledge or approval of its investors, in July 2007 Hyatt Johnson exchanged their investors' equity interests in the various LLCs managed by BCI for an approximately $23 million promissory note.  *See* Docket No. 45 at 10.

[7]    At the same time, of course, Defendants were representing to the Court that BCI was "healthy and vibrant" with over $95 million in equity.

A.      **Misrepresentations in Connection with the Hyatt Johnson "Settlement"**

Defendants' "repayment" to Hyatt Johnson was in fact a new issuance of securities that

failed to disclose material facts.  Pursuant to a September 10, 2007 agreement ("HJ Agreement"),

Defendants purportedly repaid in full and final satisfaction all amounts owed to Hyatt Johnson. [8]

*See* HJ Agreement (provided to the Court on September 14, 2007).  Under this agreement,

Defendants conveyed to Hyatt Johnson their "membership interests" in three LLCs controlled by

Defendants and cash to be paid at a later date in exchange for Hyatt Johnson's release of the

promissory note owed by Defendants.  According to the agreement, on July 19, 2007, BCI issued

a promissory note to Hyatt Johnson in the amount of $22,689,560, presumably representing the

full amount of capital investment in the LLCs managed by Defendants.[9]  *See id.* at 1.  Then, on

September 10th, in exchange for the release of this note, BCI conveyed to Hyatt Johnson "100%

of its Membership Interest" in BCI Investment 2005-1, BCI Investment IRL, and BCI 2004-8.

Defendants also agreed to pay Hyatt Johnson $1.2 million in cash by December 31, 2007 or

when the refinancing of a particular BCI aircraft occurs (whichever occurs sooner), and agreed to

assign $3.5 million from the sale of an aircraft in BCI 2005-15.[10]  *See id.* at 4-5.  Of the more

than $22.6 million owed to Hyatt Johnson, Defendants have apparently agreed to repay only $4.7

---

[8]      As discussed previously, and explained more fully below, both Hyatt and Johnson, through counsel, have informed the SEC that they intend to assert their Fifth Amendment privilege against self-incrimination regarding all questions or the production of personal documents relating to their dealings with Defendants, including these recent transactions.

[9]      This note has not been produced by Defendants, Hyatt Johnson Capital, Hyatt, or Johnson.  This exchange was done without the knowledge or approval of the Hyatt Johnson investors whose nearly $23 million had been invested in BCI LLCs.

[10]      Of this payment, $2 million is to be paid to a Hyatt Johnson Capital investor who loaned $2 million to Hyatt Johnson which purportedly was then loaned to BCI.  The SEC is unable to locate this $2 million loan to BCI anywhere in Defendants' accounting records, and despite the SEC's August 31, 2007 discovery request for documents from Defendants relating to this loan, Defendants have not provided any information.

million of this amount in cash, $3.5 million of which will be paid upon BCI's sale of a specific

aircraft, which, under the agreement, could occur as late as January 8, 2008, if at all. *See id.* at 5.

In the September 10th agreement, Defendants represent that BCI is the sole member and

owner of the LLCs known as BCI 2004-8, BCI 2005-1, and BCI Investment IRL. *See* HJ

Agreement at 1. Defendants do not acknowledge or address, however, the claims of the SEC in

its Complaint, or the findings of the Court in its Order that Defendants defrauded at least some of

the prior investors in these LLCs. In particular, Defendants failed to disclose to Hyatt Johnson

that BCI 2004-8 owns an aircraft that was purchased with misappropriated funds belonging to

investors in BCI 2004-6. The SEC has previously alleged and presented evidence during the

hearing that Defendants sold the aircraft belonging to BCI 2004-6 and misappropriated most of

the proceeds of the sale from investors. Defendants also failed to disclose that BCI 2005-1 owns

an aircraft that was purchased in part with misappropriated funds belonging to investors in yet

another offering, BCI 2004-7. These assignments of assets by Defendants, purchased using other

investors' funds, to a new LLC now owned by Hyatt Johnson, is nothing more than a

continuation of the original Ponzi scheme.

In addition, with respect to the proposed sale of the BCI 2005-15 aircraft, Defendants

failed to disclose material facts concerning their ability to generate sufficient sales proceeds. For

there to be enough money generated from Defendants' sale of the BCI 2005-15 aircraft as

represented in the agreement, the sale must at least be valued at $14 million. According to

documents submitted to Deloitte as part of the draft "audit" in February 2007, however, the fair

market value of that aircraft was estimated to be between $4.65 and $7.85 million. Thus, from

the available evidence, barring a more than doubling of the aircraft's market value in the last

seven months, it appears that Defendants, knowing the estimated market value of the aircraft,

pledged to investors sale proceeds that are highly unlikely to ever exist and are, at a minimum, materially misleading. This appears to constitute yet another material misrepresentation by Defendants in connection with the offer and sale of a security, in violation of the antifraud provisions of the federal securities laws, and also in violation of this Court's injunction.

This transaction involves securities because it is an investment that ultimately relies on the efforts of Defendants. The September 10th agreement does not explicitly state that BCI will remain the manager of these LLCs, but the transaction only conveys BCI's "membership interest" in the LLCs to Hyatt Johnson. Consequently, it appears that at least as of the execution of the agreement, BCI will still remain as manager of these LLCs, continue to collect the rental income, guarantee the loans on the various aircraft, and control the assets of the LLCs, with only beneficial ownership and profits, if any, passing on to Hyatt Johnson. Furthermore, Hyatt Johnson will be relying on BCI's efforts to sell the BCI 2005-15 aircraft at a high enough price such that Hyatt Johnson will be able to recoup its $3.5 million from the sale after $7.5 million of debt, plus $3 million earmarked for "one other group,"[11] is deducted from the sales proceeds.[12] *See* HJ Agreement at 5.

In their September 19th Surreply, Defendants claim that the SEC's assertion that the Hyatt Johnson transaction constitutes an offering of securities is "an esoteric theory." Docket No. 47 at 3. Far from being an esoteric theory, this is the very definition of an investment contract: Defendants offered and sold to Hyatt Johnson, in exchange for a release of the note they owed to Hyatt Johnson, a membership interest in LLCs managed by Defendants. In

---

[11] Defendants have not produced any information regarding this "other group" to whom this first $3 million in net proceeds was pledged.

[12] Under the agreement, this sale is intended to occur within 120 days after the date of the agreement, which is approximately January 8, 2008.

addition, Hyatt Johnson is relying on Defendants' efforts to sell a certain aircraft at a high enough price to generate sufficient net proceeds. Hyatt Johnson has invested, on behalf of its 110 investors, through a release of their note (also a securities transaction), in an enterprise in which it relies on the efforts of Defendants as manager of the LLCs and sellers of the aircraft. This constitutes an investment contract in every sense of that term.[13] To call this "an esoteric theory" strains credibility. In fact, this new transaction is nothing more than the original fraud repackaged. Simply put, the Hyatt Johnson settlement is nothing more than a continuation of the original Ponzi scheme: pledging assets rightfully belonging to prior investors (but who were fraudulently bought out of their interests) to other investors as "repayment" of the Hyatt Johnson note, a note that Hyatt Johnson investors never knew of or approved.

Defendants also express surprise that despite their claim that investors being offered new securities are "all extremely sophisticated and wealthy investors in aircraft" the SEC would still allege that these investors "are in need of the government's protection." September 19th Surreply, Docket No. 47, at 3. The antifraud provisions apply to all investors.[14] It is not permissible to defraud investors simply because they are well off financially.

This Court should be greatly concerned about this new securities offering in light of the lack of disclosure by Defendants and, for that matter, Hyatt and Johnson's refusal to provide information about their dealings with Defendants. Despite repeated voluntary requests and expedited discovery requests from the SEC, and importantly, their obligation to disclose such information pursuant to the Court's Order, Defendants have not produced any documentation regarding the buyout of Hyatt Johnson. The limited information the SEC has learned from this

---

[13]    *See* SEC v. Howey, 328 U.S. 293, 298-99 (1946).

[14]    *See* SEC's Motion to Strike Defendants' Affirmative Defenses and supporting Memorandum, filed September 20, 2007, Docket Nos. 49-50.

14

transaction has come from third parties, including Hyatt Johnson investors. Defendants have

simply refused to provide any further details or documents regarding this transaction. The lack

of disclosure from Defendants concerning Hyatt Johnson is compounded by the fact that Hyatt

and Johnson, the principals of Hyatt Johnson Capital, have both asserted, through counsel, their

Fifth Amendment privileges against self-incrimination, and their counsel have informed the SEC

that neither will appear for a deposition in this matter and that they will not produce any personal

documents pursuant to subpoena.[15]

---

[15]     Initially, counsel for Hyatt offered to provide the SEC a letter, signed by his client, memorializing the fact that Hyatt would assert his Fifth Amendment privilege against self incrimination. Counsel for Johnson also informed the SEC that his client would invoke the Fifth Amendment privilege and the SEC requested a letter signed by Johnson to that effect. After the SEC, as a courtesy, informed Defendants that it intended to seek a Motion to Show cause, counsel for Hyatt called and asked the SEC counsel to keep Hyatt's assertion of the privilege confidential. He also asked if the SEC intended to use the fact of his client's assertion in any Court filing. Similarly, late in the afternoon of October 4th, counsel for Johnson made a similar request of SEC counsel using many of the same arguments. The SEC refused to agree to keep Hyatt's and Johnson's assertions of the Fifth Amendment privilege secret for several reasons, including the fact that simultaneously with negotiating new deals with Defendants, purportedly on behalf of Hyatt Johnson investors, Hyatt and Johnson were refusing to provide information to the SEC about those and their other dealings with Defendants. The SEC believed this was material because investors were not being told of Hyatt's or Johnson's actions. In addition, the SEC told counsel for Hyatt and Johnson that it believed that sharing this information was required under its monitoring role under the Order. Finally, with regard to whether the SEC would use the fact of Hyatt's assertion in any court filing, the SEC told Hyatt's counsel that we would not confirm whether we were going to make any filings in the near future but, if the information was necessary to Hyatt's decision, then he should assume the worst. In a follow up telephone call, counsel for Hyatt again told the SEC that his client would assert his Fifth Amendment privilege but that, unless the SEC agreed to keep this information secret, he would not put that information in writing and his client would not sign an official assertion of the privilege. Counsel for Hyatt also said that he believed it was inappropriate, irrelevant and prejudicial if the SEC would use the fact of Hyatt's assertion in any filing. More than once counsel for Hyatt expressed to the SEC that he believed we cannot use the information, that it was inappropriate, and that it should be subject to a protective order. Counsel for Hyatt also told the SEC that he reserved the right to argue that the SEC's use of the information was inappropriate. The SEC disagreed with the position of Counsel for Hyatt and asked for authority. Counsel for Hyatt pointed to local rule 83.53.6. Also, the SEC as it had done in the previous conversation, invited counsel for Hyatt to seek a protective order if he felt that was necessary. Counsel for Johnson made many of the same arguments, particularly the argument that the assertion of the Fifth Amendment privilege was not relevant. Johnson's counsel also asked that the SEC file any documents mentioning Johnson's invocation of the Fifth Amendment under seal. The SEC declined to do so, among other reasons, because such a filing would deprive investors, and any other third parties involved in these transactions, from material information.

### B.    Other Suspect Transactions

The SEC has also learned of other transactions involving Defendants' supposed repayments to investors that appear to be a mere continuation of the original Ponzi scheme. Again, Defendants have disclosed virtually no information about these supposed deals and the SEC is concerned that these suspect transactions may involve pledging assets rightfully belonging to prior investors (but who were fraudulently bought out of their interests) to other investors. Certain of the BCI noteholders other than Hyatt Johnson, representing a total of about $10 million, have already been or will be purportedly repaid by being given ownership of new securities or assets owned by Defendants. Defendants have agreed with several investors to exchange their promissory notes for BCI's interests in LLCs plus the promise of some future partial repayments in cash, well beyond the 60-day deadline imposed in the Order. In addition,

---

The SEC believes that telling the Court, and the investors in this case, that the person negotiating on their behalf and purportedly protecting their interests, is simultaneously refusing to discuss their dealings with Defendants, including these new transactions, is highly relevant to both the SEC as Plaintiff and in its monitoring role under the Order. The SEC also believes it goes to its request for a Receiver. Obviously, "...the public has a right to every man's evidence..." unless privileged. In re Corrugated Container, 661 F.2d 1145, 1149 (7th Cir. 1983). In order to assert the Fifth Amendment privilege, an individual must believe they have a reasonable likelihood of criminal prosecution. *See id.* at 1150. Appropriate inferences can be drawn from an assertion of the Fifth Amendment Privilege. *See* Baxter v. Palmigiano, 425 U.S. 308 (1976). However, even with the Fifth Amendment privilege there is a presumption of innocence.

If the SEC would have agreed to Hyatt and Johnson's efforts to keep their assertions of the Fifth Amendment privilege secret, the SEC would have been complicit from keeping this important information from both the Court and Hyatt Johnson investors. The SEC would have also, if it did not provide this information to the Court, both as Plaintiff and under its monitoring role under the Order, made the Court an unwitting accomplice in not providing the investors with information they could use in considering their options. The Court also would have been deprived of information about individuals who, through their partnership, raised approximately $23 million from 110 individuals. Moreover, it was Hyatt who wrote the Court on August 14th, allegedly on behalf of their investors (but in reality without consulting them), asking the Court not to appoint a Receiver. Hyatt and Johnson, currently engaged in negotiating new deals for the issuance of new securities, would have their assertions of their Fifth amendment privilege kept secret so they can continue to keep their investors, and this Court, in the dark. The SEC was simply unwilling to be complicit in that deception. Also, of course, since "the public at large pays for the courts and therefore has an interest in what goes on at all stages of a judicial proceeding," such action on the part of a public agency would appear to violate public policy. Citizens First National Bank of Princeton v. Cincinatti Insurance Co., 178 F.3d 943, 945 (7th Cir. 1999).

similar to the Hyatt Johnson agreement, many of these new agreements are not repayments in cash, but instead are offers and/or sales of new securities. In most cases, Defendants offered new securities to the investors as repayment of their promissory notes. However, certain of the investors rejected Defendants' offer of securities, insisting on instead receiving assets, namely aircraft under Defendants' control – aircraft which may or may not rightfully belong to investors defrauded during the spring 2007 repurchasing as alleged in the SEC's Complaint.

As described further below, the terms of these agreements appear to have changed significantly from week to week as reported in Defendants' progress reports. *See* discussion in Section IV (A) *infra*. With regard to one investor who was supposed to receive "100% ownership of a specified aircraft on lease, although in this case, BCI has agreed to repurchase this aircraft if and when a sale of the aircraft can be arranged," the agreement apparently has since changed. *See* September 10th Response, Docket No. 43, at 6. In an agreement executed on September 21st, it now appears that this investor has received $350,000, plus conveyance of BCI's interest in an LLC under its control, plus $1.65 million from the sale of an aircraft BCI will attempt to sell.[16] *See* Exhibit 3. This is the same aircraft, as described above, from which Hyatt Johnson will receive $3.5 million in sales proceeds when BCI finally succeeds in selling it.

In the September 10th Hyatt Johnson agreement, the sales proceeds of the aircraft would purportedly go to (1) repay $7.5 million in debt, (2) pay $3 million to an unknown group, and then (3) $3.5 million to Hyatt Johnson. *See* HJ Agreement at 4-5. However, in this investor's

---

[16] The investor in question was originally told he would receive approximately $3.2 million in cash, the amount of his note. In their August 23rd Progress Report, Defendants reported that he had, in fact, been repaid $3.2 million in cash. However, that check was returned for insufficient funds, and it appears that Defendants are unable to make good on that bounced check again, and the investor thus appears to have settled for receiving a fraction of the originally promised cash, plus a new security from Defendants. Like Hyatt Johnson, this investor is relying on Defendants' efforts to sell this aircraft at a high enough price to repay him, and thus this settlement agreement is an issuance of a security.

17

September 21st agreement, the sales proceeds of the aircraft would purportedly go to (1) repay $7.5 million in debt, and then (2) $3.5 million to Hyatt Johnson, with no mention of the $3 million supposedly going to the unknown group. *See* Exhibit 3 at 3, 6-7. Thus, it appears that Defendants misled this investor regarding the amount of previously pledged sales proceeds. While it is possible that in the intervening period, the unknown group was paid their $3 million through other means, and thus explains the inconsistency, Defendants have not reported to the SEC, as required, repaying any group of investors $3 million in the intervening period, nor have Defendants made any other $3 million payments.

Despite being specifically asked to provide it, and as required by an expedited discovery request for documents issued on August 31st, Defendants have refused to provide any further information regarding this settlement.[17] However, from the available evidence it appears that, as described above, Defendants have, yet again, made a material misrepresentation in connection with the offer and sale of a security, in violation of the antifraud provisions of the federal securities laws, and also in violation of this Court's injunction. Finally, as noted above, it appears that the aircraft in question does not have sufficient market value to repay the amounts promised to investors and that Defendants are fully aware of this.

The SEC has also learned that Mr. Hollnagel represented to the trustee of a major investor that Defendants are unable to repay the $8 million note owed to that investor. Defendants offered instead to convey to this investor 100% of the membership interests of specific LLCs under Defendants' control, with BCI continuing to be the manager. The investor rejected this offer, and appears now to be contemplating a transaction in which the investor will give an additional $7 million in new money to BCI, plus a waiver of repayment of his $8 million

---

[17]     Defendants provided a copy of the September 21st agreement itself, but have not produced any other related documents or information about this transaction.

note, in exchange for ownership of three LLCs under BCI's control. The investor will then hire a manager to operate the LLCs with the hopes of selling the aircraft as quickly as possible. In Defendants' September 30th Progress Report, attached as Exhibit 4, they claim that $2 million of that total has already been satisfied by the conveyance of one aircraft to that investor. Again, this investor is not being repaid in cash as promised by Defendants and as ordered by this Court, and Defendants have provided no information concerning this deal to the SEC.

On October 4th, the SEC learned from an investor that Defendants paid two investors a total of $10.65 million on October 3rd. Defendants provided the SEC no notice whatsoever regarding these payments, and no details regarding the source of these funds. The SEC is concerned that at least part of this $10.65 million was derived from the $7 million new money raised from the investor as described above, or from the sale of aircraft rightfully belonging to other investors. In addition, the SEC learned that, in these recent transfers, Defendants allegedly accidentally wired $9 million to the investor owed $1.65 million, and $1.65 million to the investor owed $9 million. Complicating this scenario is the fact that the $9 million wire went to an investor in the Cayman Islands, and that Defendants may have a difficult time recovering the excess $7.35 million payment to that investor. Considering the fact that this Court has already preliminarily found defendants to have engaged in fraud, Defendants simply should not be trusted to engage in these secretive and suspect transactions for any amounts, let alone nearly $11 million.

## IV. DEFENDANTS HAVE FAILED TO COMPLY, AND CONTINUE TO FAIL TO COMPLY, WITH THE REPORTING REQUIREMENTS IN THE ORDER.

During the course of the SEC's monitoring of BCI, Defendants have failed to provide numerous reports required by the Order. Additionally, when Defendants have provided

information to the SEC, they have provided only late, incomplete, or inaccurate reports and notices. In an attempt to obtain necessary information for its monitoring function, the SEC has attempted to request more details, both voluntarily and through expedited discovery requests, but other than one instance, Defendants have refused to provide any such documents. The sum total of Defendants' behavior is a blatant contempt of the Order and obstruction of the SEC's monitoring of the repayment progress, a role this Court specifically ordered it to perform.

### A. Defendants have failed to provide complete and accurate reports of their weekly progress in repaying investors.

#### 1. Defendants' August 23rd Progress Report

The weekly progress reports of Defendants' repayment to investors have been incomplete, inconsistent, and lack sufficient detail to be meaningful. Defendants' first report of their weekly progress in repaying investors was sent to the SEC on August 23, 2007. *See* Exhibit 1 to September 14th Reply, Docket No. 45. This progress report listed payments that BCI made to twelve investors on that date, a total of approximately $12.1 million.

#### 2. Defendants' September 9th Progress Report

On September 9, 2007, Defendants reported that between August 22nd and September 9th, only seven of these investors had been repaid, a total of about $6.1 million. *See* Exhibit 2 to September 14th Reply, Docket No. 45. Defendants failed to explain why five of the twelve investors, representing $6 million, were not repaid. As the SEC has previously stated, the SEC learned from Bridgeview Bank, and not Defendants, that five of the investors, a total of $6 million, were not in fact repaid on August 23rd as represented by Defendants. Instead, these checks to investors were returned for insufficient funds because they were drawn on the Bridgeview account from which the $25 million had been seized the week before. Defendants

20

failed to mention in their September 9th progress report that these checks had been sent out but bounced, and Defendants never disclosed this fact to the SEC.  Instead, Defendants stated in the September 9th progress report that four of those missing investors had entered into a joint agreement with BCI to receive equity interests in certain LLCs under Defendants' control, in lieu of the approximately $4.5 million these investors had purportedly been sent two weeks prior. One of these investors informed the SEC that, contrary to Defendants' representations, there was no such agreement.  Thus, Defendants provided a report to the SEC that was clearly false and misleading.

### 3.     Defendants' September 14th Progress Report

In Defendants' September 14th progress report, they reported that in addition to investors already repaid, one additional investor, Jan Soderberg, had been paid.  *See* Exhibit 5.  However, this payment is not reflected in any "Check Detail" reports provided to the SEC.  *See* Exhibit 6. Furthermore, Defendants' "Check Detail" report for that period shows that an investor named Thomas Thorelli was not paid until September 14th, despite Defendants' representations in their August 23rd, September 9th, and September 14th reports that Mr. Thorelli had already been paid. *See* Exhibits 1-2 to SEC's September 14th Reply; Exhibits 5-6.  Again, Defendants' reports were false and misleading.

### 4.     Defendants' September 23rd Progress Report

Then, in Defendant's September 23rd progress report, it appears that the agreement between BCI and the four investors, as described in Defendants' September 9th report, had significantly changed.  *See* Exhibit 7.  Now, one of the investors, Jan Soderberg, had been repaid, and Mr. Strokirk appears to no longer be participating in this deal.  Instead, only Abelia Investments and the Soderstroms have reached a "final agreement" with BCI.  Defendants have

21

provided no information or explanation about the original agreement and why it changed.  It is unknown whether the original agreement was a sale of securities, whether fraudulent or legitimate.  Finally, there is no explanation for why Mr. Strokirk is no longer part of this deal or how he will be repaid now that he is not participating in this deal.

**B.**         **Defendants failed to provide a complete and accurate accounting as ordered.**

Defendants provided an accounting for the LLCs designated KLM BCI 2002-1, BCI 2004-5, and BCI 2004-6, the LLCs in which an investor still holds equity.  Defendants were ordered to provide an "immediate" accounting of these LLCs.  The accounting, not provided until September 6th, is materially incomplete and inaccurate in many important respects, and thus does not comply with the Court's Order that Defendants provide a complete and accurate accounting of those LLCs.  *See* Exhibits C-D  to September 7th Report, Docket No. 40.  By its very definition, an accounting must "account for" money used in an enterprise or transaction, which Defendants have failed to even attempt.[18]  The SEC wrote a letter to Defendants, describing in detail the missing information and inaccuracies in the accounting, and requesting clarifying and corrected information.  *See id.*  Despite this request, Defendants have still not provided a complete and accurate accounting as ordered by the Court.

First, the accounting is materially incomplete because it fails to account for the actual use of investor funds obtained by these LLCs, including oversubscribed funds, and funds obtained after the aircraft were already purchased, and funds obtained after the aircraft in BCI 2004-5 and BCI 2004-6 were sold.  Because these LLCs were significantly oversubscribed, only a small fraction of the investor funds were used to purchase aircraft.  Defendants thus provided no accounting or explanation regarding what was done with the majority of investor funds.  For

---

[18]     *See* Exhibit 8.

example, the aircraft owned by KLM BCI 2002-1 was purchased in July 2002 using investors' funds totaling approximately $4.1 million. Then, after this aircraft was purchased, Defendants raised another $2.12 million in investor funds, including $100,000 in July 2003 from the investor who continues to hold equity. Defendants have made no attempt to account for what they did with any of these additional funds, which were clearly not used to purchase the aircraft.

Second, the accounting is materially incomplete because it fails to account for the purported reinvestment of BCI 2004-5 and BCI 2004-6 investors' capital in replacement aircraft after the initial aircraft were sold in December 2004. Defendants repeatedly represented to investors that after those LLCs' aircraft were sold, investors' capital was reinvested in new aircraft. Mr. Hollnagel also testified during the SEC's investigation that this occurred. In reality, these representations were false: investor funds were never reinvested in substitute aircraft owned by those LLCs. It is unsurprising, then, that Defendants neglected to include any information about reinvestment of capital in their accounting: there was none. The SEC pointed out this discrepancy to Defendants in its letter on September 7th, and in response, Defendants claimed in their September 17th letter that these substitute aircraft were "somehow omitted in the preparation of the [accounting]."[19]  *See* Exhibit 8. In reality, now that the SEC pointed out Defendants' earlier claims regarding reinvestment of funds, Defendants are merely scrambling to keep their story straight.

Third, the accounting is materially incomplete because it fails to account for any of the $3 million in investments in BCI 2004-6 by Hyatt Johnson USA 2004 and Hyatt Johnson USA 2005, raised from approximately 38 investors. In their September 17th letter, Defendants claim

---

[19]     The updated accounting now lists the purported substitute aircraft as being purchased by these LLCs, but Defendants provided no supporting information or documents for this assertion. In fact, all documents from BCI or its auditors indicate that these aircraft were never purchased by BCI 2004-5 and BCI 2004-6. In fact, these particular aircraft were owned by other investors.

that no Hyatt Johnson related entities were ever members of BCI 2004-6, and that Hyatt Johnson was included on tax returns for this LLC in error. *See* Exhibit 8. This is false. Defendants' own accounting records and numerous other BCI records, including the Deloitte draft audit performed in early 2007, show that Hyatt Johnson USA 2004 and Hyatt Johnson USA 2005 held equity positions in BCI 2004-6. In addition, copies of cancelled checks to those Hyatt Johnson LLCs indicate that payments were made for their membership in BCI 2004-6. There is no good faith basis for Defendants' claim that no Hyatt Johnson entities were ever invested in BCI 2004-6.

In addition to being materially incomplete, the accounting contains numerous material inaccuracies. First, the accounting for BCI 2004-6 states that the initial aircraft was sold at a loss, while the tax returns prepared for BCI 2004-6 and numerous letters from BCI to investors in BCI 2004-6 state that this aircraft was sold at a profit. In addition, Mr. Hollnagel testified before the SEC that this aircraft was definitely sold at a profit, which he "guesstimated" to be about 10%.[20] Second, the "Total Purchase Price" cited for the aircraft in KLM BCI 2002-1, BCI 2004-5, and BCI 2004-6 is between $2 million and $3 million more than what is reflected in the actual purchase agreements for those aircraft, or what was reported in the draft audit by Deloitte in early 2007, as well as what was reported on the tax returns prepared for these LLCs.

Despite being ordered to provide a complete and accurate accounting, and despite being asked by the SEC to provide complete and accurate information, in response to the SEC's assertions that Defendants' accounting failed to account for the use of investor funds, Defendants responded:

> [W]e do not believe it appropriate to litigate this matter [by] email. We believe your assertions as to a purported failure to provide for an accounting for the 'use of all investor funds' in these LLCs goes to the heart of our dispute, to be resolved at trial.

---

[20]     *See* Hollnagel Testimony Transcript, Attachment A to Declaration of Scott Hlavacek, at 370-80.

*See* Exhibit 8. Rather than producing an accurate and complete accounting as ordered, or petitioning the Court for relief from this obligation, Defendants have simply declared their unwillingness to comply. It is difficult to imagine more boldfaced contempt.

**C.     Defendants have failed to provide any weekly reports of proposed withdrawals of funds.**

Defendants have never provided even a single weekly report of proposed withdrawals of funds, despite the fact that the Order explicitly required such reports. Instead, the SEC is provided only after-the-fact, vague, incomplete reports of money spent - their "Check Detail Reports," attached as Exhibit 6 – and all attempts by the SEC to obtain further information about expenditures have been ignored by Defendants. Defendants have simply made no efforts to comply with this requirement of the Order.

**D.     Defendants have failed to provide numerous 48 hour notices of withdrawals of funds.**

The Court's Order required 48 hours notice be given to the SEC prior to all expenditures of $20,000 or more. Despite this, Defendants have repeatedly failed to provide the SEC notice regarding their expenditures. On September 7th, Defendants withdrew funds for two cashier's checks totaling $460,000, and on September 14th, Defendants mailed a check for $157,500 to an investor. Defendants failed to provide the SEC with any notice of these expenditures until after the fact, when they appeared in Defendants' "Check Detail" report on September 17th. Finally, at some point between September 10th and 14th, Defendants paid $210,000 to an investor. Defendants never provided notice of this payment to the SEC. Furthermore, this payment has not appeared in any of Defendants' "Check Detail" reports, so it is unknown in what form this payment was made. *See* Exhibit 6. Likewise, Defendants reported on August 29, 2007 that they

25

would be making a monthly payroll expenditure of $210,000.  Defendants have not provided any

notice, 48 hour or otherwise, of any payroll expenditures since then.  Therefore, Defendants

either have not paid any of their employees' salaries for the past five and a half weeks or have

failed to report such payments to the SEC as required by the Order.  Finally, the SEC learned

from an investor on October 4th that Defendants paid two investors a total of $10.65 million on

October 3rd.  Defendants provided no notice whatsoever regarding these payments, and no

details regarding the source of these funds.

> **E.** **Defendants have failed to provide weekly reports of "all money paid to BCI or any BCI affiliate, including LLCs and Hollnagel in connection with BCI."**

The Court ordered that Defendants provide weekly reports of "all money paid to BCI or

any BCI affiliate, including LLCs and Hollnagel in connection with BCI."  Despite this explicit

command, Defendants did not submit any such report to the SEC until September 15, 2007.  *See*

September 19th Surreply, Docket No. 47, at 7.  This report appears to include only information

related to BCI; it does not specify any funds paid to any of the LLCs under BCI's control, and

contains no reference to Hollnagel.  Defendants have twice acknowledged their failure to comply

with this provision of the Order.  In their Response, Defendants claimed that "BCI did not

understand initially that under the Order, BCI was to report funds received by BCI."  Docket No.

43 at 10.  In their Surreply, Defendants claimed that they "[misunderstood] the requirement of

reporting to the SEC all monies paid to BCI."[21]  Docket No. 47 at 7.  Nevertheless, despite this

attempt to explain why they haven't complied with this provision of the Court Order, Defendants

have still not produced weekly reports relating to money paid to BCI affiliates or Hollnagel, and

---

[21]     These claims strain credulity, considering Defendants had at least six attorneys from four law firms at their disposal to carefully read the Court's nine-page Order, the last page of which very clearly states each of the requirements placed on Defendants.

have not asked the Court for relief from this requirement.  *See* Exhibit 9.  Once again,

Defendants simply chose to thumb their noses at the Court's Order.

    **F.**    **To the extent Defendants did report transactions required by the Order, Defendants failed to provide meaningful information about the sources and uses of such funds.**

    To the extent that Defendants did report transactions as required by the Order, they failed

to provide any meaningful information about the source of such funds, or the purpose of these

transactions.  The SEC believes that the Court intended for each of the reports required under the

Order to be meaningful, i.e. to help the SEC evaluate the transaction, and if warranted alert the

Court, and thus that the Order requires Defendants to provide at least some level of detail

regarding sources and uses of money used in reported transactions.  For example, on August 29th

Defendants reported that they were making a monthly payroll expenditure of $210,000, without

providing any breakdown of which BCI employees were paid which portions of that total.  Even

after requests for a simple breakdown by employee, Defendants have refused to provide any

details.  In another example, on August 31, 2007, the SEC made a discovery request for

documents relating to the approximately $12.2 million purportedly paid to investors on August

23, 2007, documents relating to $687,000 purportedly paid to a lender on August 28, 2007, and

documents relating to the accounting being prepared by Defendants.  The SEC has not received

any documents responsive to these simple requests.  The SEC is concerned that payments to

some investors and lenders may have come from sales of assets belonging to other investors, or

from new investments or loans from third parties, in furtherance of the same Ponzi scheme

Defendants have perpetrated.[22]  Defendants' refusal to provide any details regarding the sources of the funds being paid out only heightens and legitimizes the SEC's concerns.

Furthermore, for the SEC's monitoring function to have any meaning as intended by this Court, any reports or notices provided by BCI must include details regarding sources and uses of funds.  The SEC has made numerous document requests to Defendants specifically in order to obtain such details, and, despite the fact that over 30 days have passed since the issuance of most of these requests, Defendants have produced virtually nothing in response.  Requests by the SEC for such information are not "harassing" as repeatedly characterized by Defendants but instead are necessary to give this Court's Order real meaning.  It even appears that the SEC's monitoring is being relied upon by investors: on September 12th, Hyatt Johnson sent a letter to its investors citing the SEC's monitoring function under the Order as a safeguard that Defendants will repay investors as promised.  Defendants should simply not be allowed to continue to flout their responsibilities both under the Order and their expedited discovery obligations.

## V.  INCREDULOUSLY, DEFENDANTS BELIEVE THEY ARE NOT REQUIRED TO COMPLY WITH THE ORDER'S REPORTING REQUIREMENTS.

Defendants have repeatedly claimed that they believe they are not required to comply with the Court's Order that they provide certain reports and information to the SEC.  In their Response, Defendants claim that "BCI, its limited staff and its few informed counsel have been spending virtually every waking moment since August 22nd on the number one priority: satisfying BCI's obligations to the investors."  Docket No. 43 at 5.  Then, in their Surreply, Defendants state: "Defendants are attempting in good faith to follow this Court's Order and

---

[22]     As a further example, it appears that in August, Defendants sold aircraft in an LLC known as the TUI transaction.  The investors in that LLC have not yet received the proceeds from the sale of that aircraft.  Because Defendants have not provided any information about the TUI sale or the source of any payments, the SEC is concerned that proceeds from the sale of that aircraft are being given to other investors in unrelated deals in furtherance of Defendants' Ponzi scheme.

achieve the main result the Defendants, and presumably the Plaintiff, understand to be the focus

of the Court's Order, namely, satisfaction of investors." Docket No. 47 at 6. Defendants are

essentially claiming that as long as they are working towards the Court's Order that Defendants

repay investors, the other portions of the order, including the reporting requirements the Court

imposed on Defendants, are optional and can simply be ignored. This is incorrect. Furthermore,

the evidence shows that Defendants are not in fact acting in good faith, as evidenced by their

contempt of the Court's Order, their obstructionist efforts – including their refusal to provide

virtually any information to the SEC required under its monitoring role – and their misleading

statements to the Court.

If Defendants believed they would be unable to comply with every provision in the

Court's Order, they had an obligation to seek relief from the Court. Defendants have not sought

relief from the Order, either by asking to be released from the Order, asking for the reporting

requirements to be modified or reduced, asking the Court to reconsider its Order, or asking that

the SEC be removed as monitor. Instead, Defendants have simply violated, flouted and ignored

numerous provisions in the Order and continue in their contumacy. No one subject to a court

order – even a void order – is allowed to simply refuse to obey it.

## VI. DEFENDANTS MISLED THE COURT REGARDING THE BRIDGEVIEW DEFAULT.

### A. During the hearing, Defendants failed to tell the Court that Bridgeview had declared default and seized $25 million from BCI's accounts.

As stated in previous filings, BCI was declared in default of a covenant on a line of credit

and other loans with Bridgeview, which Defendants were informed of by a default letter on

August 16th. Under this default, Bridgeview seized approximately $25 million in BCI's

accounts on August 16th, the first full day of the evidentiary hearing before this Court, and

notified Defendants of this seizure that day.  Disturbingly, despite repeated opportunities to do so, Defendants never informed the SEC or the Court of these facts.  Instead, Defendants repeatedly represented to the Court that $12 million of this money was to be paid to investors as long as the Court did not order an asset freeze.[23]  Simply stated, and contrary to representations made to the Court, after this seizure occurred, Defendants no longer had $12 million to repay some investors, let alone the $36 million required to repay the remaining investors, and Defendants knew it.  Defendants never told the Court or the SEC, either during the hearing or after, that this money had been seized and was no longer available to repay investors.

Just as disturbing, Mr. Hollnagel specifically instructed one of the Bridgeview Bank officers to not be present in court on August 20th, the last day of the hearing, despite his offer to appear, because Mr. Hollnagel didn't "want the bank brought into this."  *See* Exhibit 10.  In fact, Mr. Hollnagel had witnessed the SEC's impromptu calling of Mr. Trabish to the witness stand on the previous day of the hearing.  Defendants likely feared that if the Bridgeview officer were present, the SEC would call him as a witness on that day of the hearing, and thus that BCI's default, and the seizure of the $25 million in funds, would be revealed during his testimony.  Instead, Mr. Hollnagel instructed the Bridgeview officer to not "come near open court," and Defendants successfully concealed the default from the SEC and the Court until long after the Court issued its Order declining to impose an asset freeze or appoint a receiver.

---

[23]     As noted by the Court in its Order, "BCI says it can immediately pay eleven of the note holders, leaving the three largest in an amount of $36 million."  This "immediate payment" was the $12 million figure cited by Defendants.  At the hearing, Defendants left no doubt that those payments would be made in cash, even though they had actual notice that Bridgeview Bank had just seized virtually all of their operating cash.

**B.     Defendants represented to the Court that they concealed nothing from the Court, and that they did not know when they received the August 16th default letter from Bridgeview.**

Incredibly, despite their behavior, Defendants claim that they "concealed nothing from the Court." September 19th Surreply, Docket No. 47, at 5. In fact, as stated above, Defendants concealed the August 16th Bridgeview default letter from the Court. In particular, Defendants chose to not disclose this fact on August 20th, the last full day of the hearing. Defendants claim that they "do not recall when they received" the default letter, pleading ignorance of the default, and thus claiming that they did not conceal that fact from the Court. *Id.* This is a blatant misrepresentation. The SEC has learned that Defendants received the default letter from Bridgeview on August 16th via fax and on August 17th via overnight mail. In addition, based on facts discovered by the SEC, Bridgeview's counsel discussed the default letter via telephone with Brian Fitzgerald, one of Defendants' counsels, at around 6pm on August 16th. Mr. Fitzgerald indicated to Bridgeview's counsel that he was aware of the default before that conversation. Mr. Fitzgerald is a law partner of Philip Feigin, one of Defendants' counsels, who was present before the Court on every day of the hearing. Thus, it is clear that Defendants were fully aware on August 16th that Bridgeview had declared BCI in default and was seizing $25 million in funds from its accounts to repay outstanding loans. Defendants then deliberately chose to conceal this from the Court on the last day of the hearing, August 20th, and then misled the Court in its Surreply regarding its knowledge of that default.

**VII.   ARGUMENT**

**A.     Civil Contempt Proceedings**

Civil contempt proceedings are authorized by 18 U.S.C. § 401(3) which states, in pertinent part, that "[a] court of the United States shall have power to punish by fine or

imprisonment, or both, at its discretion, such contempt of its authority, and none other, as …
[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." The
purpose of a civil contempt proceeding is wholly remedial and is intended to either coerce
compliance with a prior court order or compensate for losses suffered as a result of non-
compliance with that order. *See* McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949);
Commodity Futures Trading Commission v. Premex, Inc., 655 F.2d 779, 785 (7th Cir. 1981).
Where an injunction imposes a duty to obey specified provisions of a statute, failure to abide by
the injunction constitutes contempt. *See* McComb, 336 U.S. at 191-92.

In a civil contempt proceeding, the moving party must prove, by clear and convincing
evidence, that the respondent has violated the court's order. *See* McComb, 336 U.S. at 191;
Stotler & Co. v. Able, 870 F.2d 1158, 1163 (7th Cir.1989). To support a federal civil contempt
conviction, it must be proved: "(1) that the court entered a lawful order of reasonable specificity;
(2) the order was violated." Matter of Betts, 927 F.2d 983, 986 (7th Cir.1991); CFTC v.
Nickolaou, 2000 WL 1029622 at 8 (N.D.Ill. 2000). To make a *prima facie* showing of contempt,
the movant need only prove that a defendant has failed to comply with a valid court order. *See*
Heinold Hog Market, Inc. v. McCoy, 700 F.2d 611, 615 (10th Cir. 1983). A district court does
not have to find that the violation was "willful" or intentional. *See* McComb, 336 U.S. at 191;
Grove Fresh Distributors, Inc. v. John LaBatt Ltd., 888 F.Supp. 1427, 1436 (N.D. Ill. 1995). In
civil contempt proceedings, intent is not an issue, but rather, the question is whether a party has
complied with the court's order. *See* McComb, 336 U.S. at 191; SEC v. McNamee, 481 F.3d
451, 456 (7th Cir. 2007) In re General Motors Corp., 61 F. 3d 256, 258 (4th Cir. 1995); Donovan
v. Mazzola, 716 F.2d 1226, 1240 (9th Cir. 1983), *cert. denied*, 464 U.S. 1040 (1984).

Once a *prima facie* case has been shown, the burden shifts to the defendant to come forward with evidence showing categorically and in detail why he was unable to comply with court orders. *See* United States v. Rylander, 460 U.S. 752, 755, 757 (1983) *reh. denied*, 462 U.S. 1112 (1983); Chicago Truck Drivers v. Brotherhood Labor Leasing, 207 F.3d 500, 505 (8th Cir. 2000). Further, if the defendant is responsible for an inability to comply, such a defense is unavailable. *See* United States v. Bryan, 339 U.S. 323, 330-32 (1950); U.S. v. Seetapun, 750 F.2d 601, 605 (7th Cir. Ill. 1984). Even the presence of good faith on the part of a defendant does not constitute a defense. *See* Donovan, 716 F.2d at 1240. If the meaning of the order is clear, the issue is whether it has been violated. *See* Abbott Laboratories v. Apotex, Inc., 455 F.Supp. 831, 833 (N.D.Ill. 2006) (citing McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc., 154 F.3d 1345, 1353 (Fed.Cir.1998). "If it has been [violated], even if in good faith, that is a civil contempt." *Id.* Importantly, "[a] person or firm that has been enjoined has a duty to make a good-faith effort to comply with the injunction." Abbott Laboratories, 455 F.Supp. at 837.

### B. Defendants' Non-Cash Payments Violate Order.

Defendants essentially concede that, more than 30 days into the Court-ordered repayment period, they are unable to repay their investors with cash. Instead of repaying investors with cash, Defendants proposed to make whole their investors by issuing them new securities. This is not what was promised by Defendants during the hearing before this Court, nor ordered by this Court. Further, these new securities sales are a new fraud and, as such, violate this Court's injunction against further violations of the antifraud provisions of the federal securities laws.

In the Order, the Court explicitly directed Defendants to repay their noteholders within 60 days. Order at 9. It is also apparent from the Order that this directive to repay noteholders was

to repay them with cash. Never during the hearing did Defendants represent that they would

parcel out aircraft or interests in LLCs as satisfaction of the notes held by the investors.

Defendants unambiguously told this Court that they would repay the noteholders in cash. It is

clear that these representations are no longer true, if they ever were. Thus, Defendants'

repayment of noteholders with anything but cash violates the Court's Order.

In addition, Defendants attempt to repay noteholders with new securities fulfills this

Court's finding that Defendants presented an ongoing risk of future securities fraud. Defendant

Hollnagel unambiguously stated during his testimony that he was done with investors, despite

the fact, demonstrated at the hearing, that Defendants offered new securities to their noteholders

in May of 2007. The Court found this fact determinative in ruling in its Order that there is an

ongoing risk of repetition of securities fraud. *See* Order at 8. Defendants' attempted repayment

of noteholders with new securities violates the Court's directive to repay investors in cash. As

the Court has recognized with its imposition of the injunction against future fraud, Defendants

have lost the benefit of the doubt in such matters.

Furthermore, the *ad hoc* manner in which investors are being repaid is inequitable, in that

similarly situated investors are receiving disparate treatment. Investors are not given a choice

between cash and equity. Defendants have never explained why certain investors are offered

cash while others are forced to accept equity or aircraft. Investors in equal standing have been

treated differently by Defendants, as those not receiving cash are dependent upon the future

management of Defendants to ensure the value of their investment, or are burdened with the

responsibility of managing commercial aircraft themselves. In addition, at least one investor is

receiving 25% in profits above and beyond his principal, while others are only receiving their

principal.[24]  This is certainly not what this Court provided for in its Order to repay the

noteholders.  The most important directive of this Court's Order was to repay the investors, and

that Order, based on Defendants' promises, was that they would be repaid in cash.  Defendants

have not and cannot comply with this Order.  For this reason alone, the SEC requests that the

Court order Defendants to Show Cause why they should not be held in Contempt.

**C.      Defendants' Issuance of New Securities Violates the Anti-Fraud Provisions of the Order.**

The membership interests in the LLCs that BCI exchanged with its investors in

satisfaction of their promissory notes or other LLC equity interests are securities in the form of

investment contracts.  Section 2(1) of the Securities Act and Section 3(a)(10) of the Exchange

Act define "security" to include, among other things, "investment contracts."  Although

"investment contract" is not defined in these statutes, the Supreme Court has defined the term to

mean: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits

to be derived solely from the efforts of others.  *See* SEC v. Howey, 328 U.S. 293, 298-99

(1946).  The Court has stressed that the definition of an investment contract "embodies a flexible

rather than a static principle, one that is capable of adaptation to meet the countless and variable

schemes devised by those who seek the use of the money of others on the promise of profits."  Id.

at 299.  More recently, the Court reiterated that Congress intended a broad, inclusive definition

of investment contract, stating that "Congress' purpose in enacting the securities laws was to

regulate *investments*, in whatever form they are made and by whatever name they are called.  To

that end, it enacted a broad definition of "security," sufficient "to encompass virtually any

instrument that might be sold as an investment." SEC v. Edwards, 540 U.S. 389, 393 (2004)

(citations omitted) (italics in original).  Applying these principles and the test set out in Howey,

---

[24]      This investor's representative, Steven Trabish, testified to this effect at the hearing.

the membership interests in the LLCs offered by Defendants in exchange for the promissory notes are investment contracts and therefore securities covered under the federal securities laws.

In this case, the first <u>Howey</u> factor is satisfied, as it is clear that investors in the LLCs provided an investment of money to Defendants. In all instances, the investors and noteholders were offered membership interests LLCs managed by Defendants. The Court found these facts to be true in its Order, and in fact, Defendants admitted that they sold membership interests in LLCs to investors in its Answer. *See* Docket No. 38 at ¶ 1.

The "common enterprise" factor appears to be satisfied here, as well. The Seventh Circuit requires "horizontal commonality," meaning that there must be a pooling of interests between the investors and the developer or the promoter, as well as a pooling of interests among the investors. *See* <u>Wals v. Fox Hill Development Corp.</u>, 24 F.3d 1016, 1017-19 (7th Cir. 1994); <u>Stenger v. R.H. Love Galleries, Inc.</u>, 741 F.2d 144, 146-47 (7th Cir. 1984). With at least the Hyatt Johnson buyout, a common enterprise with the required pooling of interests occurred. According to the settlement agreement, BCI and Hyatt Johnson collapsed all of the multiple investments of Hyatt Johnson into one promissory note in July 2007. Then, this note was later exchanged for BCI's equity interests in LLCs which are under the management of Defendants. Thus, all Hyatt Johnson investors were pooled together and placed in equal standing with one another. Their interests are also intertwined with BCI in that Defendants remain the manager of the LLCs that the Hyatt Johnson investors received in exchange for releasing their promissory note. The success of their investments depends on the success of Defendants' management of the LLCs, as the manager is responsible for leasing and maintaining the aircraft owned by the LLCs. Accordingly, horizontal commonality is present.

The third <u>Howey</u> factor, profits from the efforts of others, is also met. As described above, the LLC investments were offered such that investors expected their profits to come solely from the efforts of Defendants as manager of the LLCs. In this instance, Hyatt Johnson received BCI's purported equity interests in the LLCs they also manage, and is relying on Defendants to sell one of the aircraft they control in order to repay Hyatt Johnson a portion of the sales proceeds. The agreement does not remove BCI from their role as manager, and thus, Hyatt Johnson will be dependent upon Defendants. Based on the information provided the SEC, the Hyatt Johnson buyout is an investment contract, and as such, under the purview of the federal securities laws.

Defendants have not produced any information to the SEC related to the Hyatt Johnson buyout. Despite repeated requests for more information, Defendants have only stated to the SEC that they are proceeding with the repayment of Hyatt Johnson but have supplied no details of the deal. Importantly, the only details the SEC has received on this deal came from third parties, including Hyatt Johnson investors. The Hyatt Johnson settlement agreement appears to misrepresent and omit material facts. First, Defendants represent that BCI is the 100% owner of the LLCs that they are offering to Hyatt Johnson. This agreement omits, however, that the SEC has alleged in the Complaint that Defendants misappropriated investor funds to enrich themselves, and further defrauded investors through the offer to buy out their investors beginning in early 2007. These are the means by which Defendants obtained their purported interest in the majority of the LLCs it claims it owned – through misappropriated investor funds or the deceptive buyouts. The agreement is also silent about the findings of this Court that Defendants defrauded their investors and acted with scienter. Furthermore, the agreement is silent as to

other material facts, among them, that the one of the pledged LLCs obtained its aircraft through misappropriated funds.

In terms of this repayment, these proposed deals represent ongoing fraudulent conduct presenting additional risk of loss to the investors. Not only are the investors reliant upon Defendants' continued management of the LLCs, the fraudulent nature in which Defendants came to possess the LLCs imposes additional exposure to the investors that cash may not. As the Seventh Circuit recently ruled, if money or property is obtained through knowingly false representations, the scheme to defraud is established, regardless of whether the defendant hoped, intended, or even expected that the victims would eventually be repaid. *See* U.S. v. Hamilton, 2007 WL 2429477 at 2 (7th Cir. 2007). Instead of making them whole, these non-cash settlement offers present more problems to the noteholders, and in fact, violate the Court's injunction against future securities laws violations.

Moreover, it is impossible for the SEC, in its role as monitor, to endorse or passively observe the Hyatt Johnson buyout when Defendants in this action refuse to disclose any facts related to this deal and the other principals in the deal, Messrs. Hyatt and Johnson, have informed counsel for the Commission that they would both assert their Fifth Amendment privilege against self-incrimination. The Court should find no comfort in Defendants' claims that they are satisfying their obligations to repay their investors amid these circumstances. While simultaneously negotiating with Defendants on behalf of their investors, Hyatt has refused to provide any information, either documents or testimony, concerning this buyout and his dealings with Defendants on the grounds that it may incriminate him. For his part, Johnson has informed the Commission he will refuse to answer any questions relating to his dealings with BCI or produce any personal documents which may relate to these dealings. These assertions of their

38

Fifth Amendment privilege, combined with Defendants' complete lack of candor relative to the deal, forces the SEC to alert the Court to this ongoing fraud on investors.

### D. Defendants' Failure to Provide Disclosures to the SEC Violates the Order.

In addition to their failure to repay the noteholders, Defendants have repeatedly violated the Court's Order compelling the disclosure of certain financial information. In several instances, the information provided by Defendants was late or incomplete to the extent that the disclosures were meaningless. On other occasions, Defendants have never disclosed reports or records they were required to produce. Even after several requests by the SEC, Defendants have simply refused to supply mandated information.

As expressed above, Defendants have produced only minimal documents and records related to their progress in repaying their noteholders. Only after the SEC informed Defendants that it would file a Motion to Show Cause did Defendants begin to produce documents and records responsive to document requests relating to the repayment of its noteholders. These minimal disclosures, however, contained only partial productions of only two of the numerous settlement agreements with investors. Defendants have thus far refused to produce any information about the source of funds used repay certain investors.

Defendants also failed to provide other required documents and reports to the SEC. The accounting provided by Defendants is incomplete and inaccurate. The accounting does not account for the actual use of investor funds, including oversubscribed funds, and funds obtained after the aircraft were already purchased, and funds obtained after the aircraft in BCI 2004-5 and BCI 2004-6 were sold. The accounting also fails to identify any reinvestment of investor capital after Defendants sold the aircraft belonging to BCI 2004-5 and BCI 2004-6. The accounting also fails to address any of the $3 million of Hyatt Johnson investments in BCI 2004-6. In addition to

these deficiencies, the accounting, as explained above, contains numerous inaccuracies, including the false representations that aircraft were sold at a loss.

There have been several other violations of the disclosure requirements. Defendants have never provided a weekly report of proposed withdrawals of funds, despite the explicit order to do so. On several occasions, Defendants have failed to provide 48 hour notice on expenditures over $20,000. Defendants have only provided one purported report of "all money paid to BCI or any BCI affiliate, including LLCs and Hollnagel in connection with BCI." However, this document only reports money paid to BCI; it does not include any reference to any money paid to Hollnagel or any BCI affiliate. Thus, Defendants' failure to follow the Court's Order is not limited to repayment of noteholders. Defendants have repeatedly disregarded the Court's reporting requirements, substantially impairing the SEC's role as monitor to the point such that this role is illusory.

These actions reveal Defendants' deliberate disregard of the Court's Order. Defendants' repeated, comprehensive violations of the Order indicate willful conduct. Of course, it is black letter law that no one has the right to flout or ignore a Court order. *See* McComb, 336 U.S. at 192. If there are extenuating circumstances, or if the Order is too burdensome, Defendants could have petitioned this Court for modification or clarification of the Order. Id. In this case, however, Defendants have not done so. As stated by the Supreme Court in McComb, when Defendants decide for themselves the meaning of a Court Order, they act at their own peril. Id. This principle was recognized more recently in this Circuit. As expressed by the Honorable Milton I. Shadur:

> After all, he [Defendant Thomas Quinn] has arrogantly and surreptitiously flouted a court order of which he was fully cognizant. No one has the right to do that even if such a court

> order is downright void. That has been crystal clear for nearly a
> half-century. It cost the United Mine Workers of America $3.5
> million to learn that lesson–at a time when that represented real
> money. U.S. v. United Mine Workers of America, 330 U.S. 258,
> 91 L. Ed 884, 67 S. Ct. 677 (1947). Indeed, so powerful is the
> notion that litigants must observe the regularized form of judicial
> proceedings by moving to vacate even a void court order, rather
> than engaging in self-help by ignoring it, that such obligation
> prevails even where the litigant's conduct involves the exercise of
> *First Amendment* rights. (Id.) (Citations omitted) (Emphasis in
> original)

SEC v. Arnold Kimmes, et al., 753 F. Supp. 695, 700 (N.D. Ill. 1990). The Court made explicit

the conditions upon which Defendants were to conduct their affairs in lieu of the appointment of

a receiver. Defendants repeatedly violated these conditions and continue to do so.

###### E.    Defendants' Weak Financial Condition Further Threatens Investors.

As described in prior filings with this Court, Defendants' weak financial condition has

been exposed since the Order. Even preceding the filing of this lawsuit, Defendants have

consistently failed to repay their investors and creditors. Despite offers to buy out its investors in

March 2007, Defendants were able to repay only a portion. The majority of investors received

only promissory notes, guaranteed by BCI. If Defendants had the ability to pay its investors in

cash in the spring and summer of 2007, it would and should have done so. Immediately

following the SEC's Complaint, and during the evidentiary hearing, one of Defendants' primary

creditors, Bridgeview Bank, seized more than $25 million from Defendants' bank accounts,

which was the entire cash balance in Defendants' operating account. Defendants, however, kept

this fact secret, and instead represented to this Court that BCI was a "healthy and vibrant"

company and could easily repay all investors in cash. Clearly, matters were not what they

appeared or what Defendants would have this Court believe.

41

In addition to the actions of Bridgeview Bank, other creditors have already instituted actions against Defendants. Fifth Third Bank and GMAC Credit ("GMAC") have either seized cash or have initiated foreclosure proceedings against Defendants. GMAC issued to Defendants a default letter in early May 2007, well before the SEC's lawsuit. Unsecured creditors who cannot self-help have also taken steps against Defendants. Unsecured creditor Ungaretti & Harris LLP have moved to intervene in this action because of Defendants' failure to pay more than $500,000 in legal bills. *See* Docket at 52-53. The SEC has learned that Defendants owe approximately $350,000 to a Plaintiff, pursuant to a settlement agreement in a lawsuit in the Northern District of Illinois, towards which they have made no payments, despite being required to do so under an order by Judge Kennelly. Finally, the SEC is aware of at least one other creditor who claims to be owed $110,000 by Defendants and who has not been paid. Defendants' attempts to repay certain noteholders with securities interests or aircraft are admissions that they cannot pay cash. It also reveals that Defendants are offering preferential treatment to similarly situated noteholders: some noteholders are offered cash, others are not. The actions of Defendants' creditors further indicate that Defendants are not financially sound. Together, these facts, along with Defendants' contempt and violation of the Temporary Injunction, demonstrate the need for a receiver over BCI, who will ensure that all noteholders and creditors are treated equitably.

## VIII.    CONCLUSION

For the reasons stated above, the SEC moves this Court for an Order to Show Cause why Defendants should not be held in contempt of the Court's August 22, 2007 Order. Defendants cannot, and have expressed their clear intention not to, repay investors in cash within 60 days as required under the Order. Defendants have also failed to comply, and continue to fail to comply,

42

with the reporting requirements in the Order.  In addition to Defendants' misconduct, creditors

have engaged in self-help actions against Defendants, further weakening Defendants' ability to

repay their investors.  Events since the Order demonstrate Defendants' contempt and utter

unwillingness to be open and honest regarding its dealings with investors, and the continued

need for a receiver in this matter.


Respectfully submitted,


s/ Robin Andrews
Gregory von Schaumburg, IL Bar No. 3127782
Robin Andrews, IL Bar No. 6285644
John J. Kaleba
Charles J. Kerstetter
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE COMMISSION
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated:  October 5, 2007